This Opinion is a
Precedent of the TTAB

Mailed: March 12, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*In re Mecca Grade Growers, LLC*

————

Serial No. 86358219

————

Matthew R. Wilmot of Stoel Rives LLP,
    for Mecca Grade Growers, LLC.

Dawn Feldman Lehker, Trademark Examining Attorney, Law Office 111,
    Robert L. Lorenzo, Managing Attorney.

————

Before Zervas, Lykos and Masiello,
    Administrative Trademark Judges.

Opinion by Lykos, Administrative Trademark Judge:

Mecca Grade Growers, LLC ("Applicant") seeks to register as a mark on the

Principal Register MECHANICALLY FLOOR-MALTED in standard characters for

"[m]alt for brewing and distilling" in International Class 31 and "[p]rocessing of

agricultural grain" in International Class 40.[1] Applicant has appealed the Trademark

———————————

[1] Application Serial No. 86358219, filed August 5, 2014, under Section 1(a) of the Trademark
Act, 15 U.S.C. § 1051(a), alleging July 14, 2014 as the date of first use anywhere and in
commerce.

Examining Attorney's final refusal to register the mark on the Principal Register under Section 2(e)(1) of the Trademark Act, 15 U.S.C. § 1052(e)(1), on the ground that it is merely descriptive of the identified goods and services and, alternatively, to register the mark on the Supplemental Register, under Sections 23 and 45 of the Trademark Act, 15 U.S.C. §§ 1091(c) and 1127, on the ground that the proposed mark is generic, and is thus incapable of distinguishing the identified goods and services. The appeal is fully briefed.

## I. Procedural Background

The Examining Attorney initially refused registration under Trademark Act Section 2(e)(1) on the ground that Applicant's mark is merely descriptive of the identified goods and services. The Examining Attorney also advised Applicant that because the mark appeared to be generic, she could not suggest an amendment to seek registration under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f), or on the Supplemental Register. In response, Applicant presented arguments that its applied-for mark is neither merely descriptive nor generic; however, it did not amend its application to seek registration under Section 2(f) or on the Supplemental Register. Unconvinced, the Examining Attorney made final the descriptiveness refusal under Section 2(e)(1).

Applicant then timely filed a notice of appeal and brief. Instead of briefing the descriptiveness refusal, Applicant focused solely on the issue of genericness. 4 TTABVUE. The Examining Attorney correctly pointed out in her appeal brief that because Applicant never formally sought to amend its application to seek registration

on the Principal Register under Section 2(f) or on the Supplemental Register, the issue of genericness was not before the Board. 6 TTABVUE. *See* Trademark Manual of Examining Procedure ("TMEP") §§ 1209.02(a)(i) and (ii) (Oct. 2017). This prompted Applicant to file a request for remand and a formal amendment of its application to seek registration in the alternative on the Supplemental Register. 7 & 9 TTABVUE. Following the amendment, the Examining Attorney issued a refusal of registration on the Supplemental Register under Trademark Act Sections 23 and 45 on the ground that the mark is generic and therefore incapable of distinguishing the identified goods and services, and the Examining Attorney ultimately made that refusal final. After the appeal resumed, the Examining Attorney and Applicant then filed a second set of appeal briefs. In this subsequent round of briefing, Applicant again focused solely on the issue of genericness and failed to present arguments in its brief to refute the descriptiveness refusal. 13 & 16 TTABVUE. Nonetheless, during prosecution, Applicant made clear that its amendment to the Supplemental Register was made in the alternative:

> In amending to the Supplemental Register, Applicant makes no admissions as to the distinctiveness (or the alleged lack thereof) of its MECHANICALLY FLOOR-MALTED mark and this amendment should not be interpreted or construed as such. All arguments as to the distinctiveness of the mark are hereby expressly reserved and retained by Applicant. (9 TTABVUE 1.)

This statement, along with Applicant's statements in its brief (13 TTABVUE 5 at n.2), indicate that Applicant does not concede that its mark is merely descriptive. Thus, for purposes of completeness, we have exercised our discretion to consider

Applicant's arguments made during prosecution with regard to the descriptiveness refusal.

## II. Descriptiveness Refusal

We commence with the question of whether Applicant's standard character mark MECHANICALLY FLOOR-MALTED is merely descriptive of "[m]alt for brewing and distilling" in International Class 31 and "[p]rocessing of agricultural grain" in International Class 40.

In the absence of a showing of acquired distinctiveness, Section 2(e)(1) of the Trademark Act precludes registration of a mark on the Principal Register that, when used in connection with the goods or services of the applicant, is merely descriptive of them. 15 U.S.C. § 1052(e)(1). "A term is merely descriptive if it immediately conveys knowledge of a quality, feature, function, or characteristic of the goods or services with which it is used." *In re Chamber of Commerce of the U.S.,* 675 F.3d 1297, 102 USPQ2d 1217, 1219 (Fed. Cir. 2012) (quoting *In re Bayer AG*, 488 F.3d 960, 82 USPQ2d 1828, 1831 (Fed. Cir. 2007)); *see also In re TriVita, Inc.,* 783 F.3d 872, 114 USPQ2d 1574, 1575 (Fed. Cir. 2015). By contrast, a mark is suggestive if it "requires imagination, thought, and perception to arrive at the qualities or characteristics of the goods [and services]." *In re Gyulay*, 820 F.2d 1216, 3 USPQ2d 1009, 1009 (Fed. Cir. 1987).

The determination of whether a mark is merely descriptive must be made in relation to the goods and services for which registration is sought, not in the abstract. *In re Chamber of Commerce*, 102 USPQ2d at 1219; *In re Bayer*, 82 USPQ2d at 1831.

This requires consideration of the context in which the mark is used or intended to be used in connection with those goods or services, and the possible significance that the mark would have to the average purchaser of the goods or services in the marketplace. *In re Chamber of Commerce*, 102 USPQ2d at 1219; *In re Bayer*, 82 USPQ2d at 1831; *In re Omaha Nat'l Corp.*, 819 F.2d 1117, 2 USPQ2d 1859 (Fed. Cir. 1987). In other words, the question is not whether someone presented only with the mark could guess the goods and services listed in the identification. Rather, the question is whether someone who knows what the goods and services are will understand the mark to convey information about them. *DuoProSS Meditech Corp. v. Inviro Med. Devices, Ltd.,* 695 F.3d 1247, 103 USPQ2d 1753, 1757 (Fed. Cir. 2012) (quoting *In re Tower Tech, Inc.,* 64 USPQ2d 1314, 1316-17 (TTAB 2002)); *see also In re Patent & Trademark Servs. Inc.,* 49 USPQ2d 1537, 1539 (TTAB 1998); *In re Home Builders Ass'n of Greenville*, 18 USPQ2d 1313, 1317 (TTAB 1990); *In re Am. Greetings Corp.*, 226 USPQ 365, 366 (TTAB 1985).

Evidence that a term is merely descriptive to the relevant purchasing public "may be obtained from any competent source, such as dictionaries, newspapers, or surveys," *In re Bayer*, 82 USPQ2d at 1831, as well as "labels, packages, or in advertising material directed to the goods…." *In re Abcor Dev. Corp.,* 588 F.2d 811, 200 USPQ 215, 218 (CCPA 1978). It may also be obtained from Applicant's own specimen of use and any explanatory text included therein. *In re N.C. Lottery*, 866 F.3d 1363, 123 USPQ2d 1707, 1710 (Fed. Cir. 2017); *In re Nett Designs Inc.*, 236 F.3d 1339, 57 USPQ2d 1564, 1565 (Fed. Cir. 2001).

Based on the evidence of record, we find that Applicant's mark immediately conveys to prospective consumers characteristics of both the goods and the services. With regard to the International Class 31 goods, "mechanically floor-malted" immediately conveys to prospective consumers an attribute of "[m]alt for brewing and distilling." With respect to the International Class 40 services, Applicant's proposed mark serves as an adverbial phrase that immediately conveys how the "[p]rocessing of agricultural grain" is performed.

The adverb "mechanically" is derived from the adjective "mechanical" which is defined as "of or relating to machinery" or "produced or operated by a machine or tool."[2] Merriam-Webster (www.merriam-webster.com/dictionary/mechanical)."Floor-malted" is the adjectival form of the verb "floor malting." In the brewing and distilling industry, "floor malting" refers to "the practice of germinating (malting) steeped barley on the floor of the malt house," which can be performed manually or with machinery. Midwest Supplies Homebrewing & Winemaking (www.midwestsupplies.com), November 20, 2014 Office Action, TSDR p. 2. The traditional method of floor malting is highly labor intensive:

> Floor malting takes its name from the practice of germinating (malting) steeped barley on the floor of the malt house. The steeped grains would be deposited on one end of the floor. As the grains began to germinate, and heat would build, skilled workers would spread the malt out in thin layers on the floor. The germinating grains would then be turned periodically to prevent the emerging rootlets from growing into a solid mass, and to maintain the proper temperature and humidity for malting. …

---

[2] We take judicial notice of the dictionary definition from the online version of Merriam-Webster. *In re Thomas White Int'l Ltd.*, 106 USPQ2d 1158, 1160 n.1 (TTAB 2013) (judicial notice taken from dictionary existing in print format).

This process was replaced by the more consistent and uniform industrial malting practices in use today, but is still practiced by a few artisanal malting houses.

*Id.* The process of floor malting evolved with the substitution of machinery for manual labor; the mechanical process of floor malting has been explained as follows:

With the advent of modern power, the first changes that occurred were the introduction of ventilating fans and water pumps into the older type houses as described. Later, more modern buildings were introduced incorporating the various devices made available by the new power. In these earliest modern houses, steel tanks were substituted for the old-fashioned cisterns, large fans were employed for ventilation, and adequate sprinkler systems installed. However, the old-fashioned masonry floor still persisted with the consequent heavy work of hand shoveling. It was under these semi-modern methods that malt acquired its present status.

The next step was the modern construction known as the compartment system. Here the steeped barley is deposited on perforated floors in a single bed through which moist cool air is drawn by fans to control temperatures as desired. Agitation is by means of large turning machines which periodically agitate and redistribute the malt. When germination is completed, the malt is scooped into mechanical conveyors by mechanical shovels. The conveyor deposits it in the kiln house, which again has perforated metal floors through which hot air is drawn by other fans. In this case, however, the floors are sectional, so that they can be opened, and the malt dropped through. It is possible in a modern kiln to reduce the moisture content to 3 percent.

After drying, the malt is dropped directly from the floor to hoppers located beneath, which feed conveyors, which, in turn, transport the finished malt to the cleaning and storing house. The prime object of modern houses is not only to give maximum production in a given area, but to decrease manual labor by the use of mechanical devices.

*Id.* at 6-7. *See also* web site excerpt from Briess Malt & Ingredients Co. (www.briess.com/food/Processes/malthistory.php) "Floor Malting is Born" and

"Malting Goes Modern," July 2, 2015 Final Office Action, TSDR pp. 3-5. Applicant's specimen explains in further detail what "floor-malted" malt is as well as the particular process of "mechanical floor-malting" it employs to produce this kind of malt:

> The practice of malting grain for use in beer and spirits reaches back into ancient history, and is a tradition historically bound to America's identity. Did you know Samuel Adams worked in his family's malthouse, not as a brewer? Some of the world's most sought after malt is still prepared in this traditional manner. Commonly referred to as "floor-malting," grain that has been soaked in water for up to 48 hours is spread over a cement floor to an even depth of 8"-12" inches. The grain is turned by hand every 8 hours so that the heat generated from the growing barley does not kill the grain. After the main shoot, or acrospire, has grown the length of the grain, the entire batch is dried in a kiln and then roasted to stop the grain from growing, dry the grain, and to develop flavors and color. Think about eating a plain piece of bread compared to one that has been toasted for just the right amount of time and you will have a fairly good picture of this process.
>
> Floor-malting is considered the pinnacle of "artisanal" malting … however, there are very few sources for this type of premium malt. Even if you happen to find a craft malt that has been floor-malted, inconsistencies occur from batch to batch.
>
> By combining the old world approach to floor-malting with today's modern technology, we have designed a malting machine capable of producing the finest quality, consistent malt available. We call this proprietary process: "Mechanical Floor-Malting."
>
> Our Mechanical Floor-Malters are capable of producing 10-15 tons of finished malt. Our grain bed depths are shallow, 12-16", just like traditional floor malting systems. Most commercial malt is produced in deep grain beds anywhere from 3 to 4 feet. Hot air is forced up through this bed in order to kiln the malt resulting in a large use of energy. Stratification also occurs because this grain isn't turned completely over during the malting process. Our Mechanical Floor-Malter is a continuously moving circuit of grain inside a closed system. Each step of the malting process takes

place within this system, making our machines a "uni-malter."
Continuous movement and shallow grain beds equal reduced
energy consumption and more consistent malt.

Thus, the explanatory text from Applicant's own specimen makes clear that it produces a specific type of malt known as "floor-malted" malt and that Applicant's grain processing services substitute mechanization for traditional floor-malting techniques. *See In re N.C. Lottery*, 123 USPQ2d at 1710 ("the TTAB did not err by considering the explanatory text of the specimens in the descriptiveness inquiry").

In addition, the record shows that it is not uncommon for artisan brewers to market their beer as "floor malted" (see "Weyermann floor malted Bohemian Pilsner malt" at www.brooklynbrewery.com July 2, 2015 Office Action, TSDR p. 7) or for malt producers to use a mechanized version of floor malting (see Briess Malt & Ingredients Co., www.briess.com/food/Processes/malthistory.php, "Floor Malting is Born" and "Malting Goes Modern," July 2, 2015 Final Office Action, TSDR pp. 3-5). For example, Weyermann touts the benefits of floor malted malt:

Bohemian grown wheat is expertly floor malted in Weyermann's®
traditional facility in the Czech Republic. Floor malting gives the
malt an earthy, satisfying aroma and intense, malty flavor. High
proportions of floor malted grain provide a smooth mouth feel.

"Weyermann floor malted Bohemian Pilsner malt" at www.brooklynbrewery.com July 2, 2015 Office Action, TSDR p. 7. This evidence bolsters our finding that the mark is merely descriptive.

Applicant argues that MECHANICALLY FLOOR-MALTED is suggestive in relation to the identified goods and services because the juxtaposition of "mechanically" with "floor-malted" results in an incongruity. As Applicant postulates:

> [T]he term 'mechanical' is entirely contradictory to the 'floor malting' method of processing grains by hand - by definition, the very process of 'floor malting' is not mechanized or automated. The term "mechanical" also carries with it certain industrial connotations, connotations that stand in stark contrast to the artisanal, old-world connotations association with the term "floor malting." As such, brewers and distillers encountering Applicant's mark in the marketplace will necessarily undertake a "mental pause" in order to reconcile the apparent contradiction in terms presented by Applicant's mark.

May 20, 2015 Response to Office Action. Applicant's argument is unpersuasive. Applicant has not demonstrated that the relevant public perceives the floor malting process as one that must be performed by hand to such an extent that they would find incongruous the suggestion that it could be performed with mechanical assistance. To the contrary, the evidence demonstrates that mechanical assistance has been used in the past for some time in order to facilitate the floor malting process.

When two or more merely descriptive terms are combined, the determination of whether the composite mark also has a merely descriptive significance turns on the question of whether the combination of terms evokes a non-descriptive commercial impression. If each component retains its merely descriptive significance in relation to the goods or services, the combination results in a composite that is itself merely descriptive. *In re Oppedahl & Larson LLP*, 373 F.3d 1171, 71 USPQ2d 1370 (Fed. Cir. 2004); *see also In re Carlson*, 91 USPQ2d 1198 (TTAB 2009); *In re Putman Publ'g Co.*, 39 USPQ2d 2021 (TTAB 1996). However, a mark comprising a combination of merely descriptive components is registrable if the combination of terms creates a unitary mark with a non-descriptive meaning, or if the composite has a bizarre or incongruous meaning as applied to the goods. *In re Colonial Stores Inc.*, 394 F.2d 549, 157 USPQ

382 (CCPA 1968). Applying these principles, Applicant's arguments are belied by the evidentiary record showing that the process of "floor malting," while once performed manually, has evolved to incorporate mechanization. Applicant does not point to an incongruous meaning of MECHANICALLY FLOOR-MALTED in relation to its goods and services other than implying, implausibly, that the process of floor malting can be performed only by hand. As a whole, the mark does not have a separate non-descriptive meaning.

In sum, no imagination or thought is required by prospective consumers to discern the nature of Applicant's goods and services. In other words, Applicant's proposed mark immediately conveys, without conjecture or speculation, an attribute of Applicant's malt and the mechanical nature of Applicant's processing services. The inclusion of a hyphen in Applicant's mark has no effect on the mere descriptiveness of the mark as a whole. *See In re Vanilla Gorilla, L.P.*, 80 USPQ2d 1637, 1640 (TTAB 2006).

Accordingly, we find Applicant's proposed standard character mark MECHANICALLY FLOOR-MALTED to be merely descriptive of "[m]alt for brewing and distilling" in International Class 31 and "[p]rocessing of agricultural grain" in International Class 40, and therefore ineligible for registration on the Principal Register in the absence of a showing of acquired distinctiveness.

## III.   Genericness Refusal

Having determined that Applicant's mark is not eligible for registration on the Principal Register absent a showing of acquired distinctiveness, which showing has

not been made because Applicant did not pursue it as an alternative, we now consider Applicant's amendment in the alternative to the Supplemental Register. "In order to qualify for registration on the Supplemental Register, a proposed mark 'must be capable of distinguishing the applicant's goods or services.'" *In re Emergency Alert Sols. Grp., LLC*, 122 USPQ2d 1088, 1089 (TTAB 2017) (quoting 15 U.S.C. § 1091(c)). "Generic terms do not so qualify." *Id. See also Clairol, Inc. v. Roux Distrib. Co.*, 280 F.2d 863, 126 USPQ 397, 398 (CCPA 1960) ("The generic name by which a product is known is not a mark which can be registered on the Supplemental Register under [S]ection 23 because such a name is incapable of distinguishing applicant's goods from goods of the same name manufactured or sold by others."). A generic term "is the common descriptive name of a class of goods or services." *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 114 USPQ2d 1827, 1830 (Fed. Cir. 2015) (quoting *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 228 USPQ 528, 530 (Fed. Cir. 1986)). Because generic terms "are by definition incapable of indicating a particular source of the goods or services," they cannot be registered as trademarks. *Id.* (quoting *In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 57 USPQ2d 1807, 1810 (Fed. Cir. 2001)); *see also In re Cordua Rests., Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1634 (Fed. Cir. 2016). "The critical issue in genericness cases is whether members of the relevant public primarily use or understand the term sought to be protected to refer to the genus of goods or services in question." *Princeton Vanguard*, 114 USPQ2d at 1830 (quoting *Marvin Ginn*, 228 USPQ at 530). Making this determination "involves a two-step inquiry: First, what is the genus of goods or

services at issue? Second, is the term sought to be registered ... understood by the relevant public primarily to refer to that genus of goods or services?" *Marvin Ginn*, 228 USPQ at 530. *See also Princeton Vanguard,* 114 USPQ2d at 1829 ("there is only one legal standard for genericness: the two-part test set forth in *Marvin Ginn*"). "An inquiry into the public's understanding of a mark requires consideration of the mark as a whole." *Id.* at 1831 (quoting *In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1420, 1421 (Fed. Cir. 2005)). "Even if each of the constituent words in a combination mark is generic, the combination is not generic unless the entire formulation does not add any meaning to the otherwise generic mark." *In re 1800Mattress.com IP LLC*, 586 F.3d 1359, 92 USPQ2d 1682, 1684 (Fed. Cir. 2009) (quoting *In re Steelbuilding.com*); *see also Princeton Vanguard*, 114 USPQ2d at 1832.

Competent sources to show the relevant purchasing public's understanding of a contested term include purchaser testimony, consumer surveys, dictionary definitions, trade journals, newspapers and other publications. *Id.* at 1830; *In re Bed & Breakfast Registry,* 791 F.2d 157, 229 USPQ 818, 819 (Fed. Cir. 1986). In the *ex parte* context, "[a] registration is properly refused if the word is the generic name of any of the goods or services for which registration is sought." *In re Cordua,* 118 USPQ2d at 1638 (quoting 2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 12:57 (4th ed. 2016)). The Trademark Examining Attorney has the burden of proving genericness by "clear and convincing evidence." *Id.* at 1635; *In re Hotels.com,* 573 F.3d 1300, 91 USPQ2d 1532, 1533 (Fed. Cir. 2009); *In re Gould Paper Corp.,* 834 F.2d 1017, 5 USPQ2d 1110, 1111 (Fed. Cir. 1987); *In re Merrill*

*Lynch, Pierce, Fenner and Smith, Inc.*, 828 F.2d 1567, 4 USPQ2d 1141, 1143 (Fed. Cir. 1987).

We begin by agreeing with the Examining Attorney that the genus at issue in this case is adequately defined by Applicant's identification of goods ("[m]alt for brewing and distilling") and services ("[p]rocessing of agricultural grain").[3] *See Magic Wand Inc. v. RDB Inc.*, 940 F.2d 638, 19 USPQ2d 1551, 1552 (Fed. Cir. 1991) ("[A] proper genericness inquiry focuses on the description of [goods or] services set forth in the [application or] certificate of registration."). We further find based on the identification, which contains no restrictions as to trade channels or end users, that the relevant purchasing public for Applicant's goods comprises persons and entities that purchase and use malt for brewing and distilling, and that the relevant purchasers of Applicant's agricultural grain processing services includes persons and entities that have or obtain grain and need to have it malted. *See also* Applicant's specimen ("Craft brewers and distillers want local, expect quality, but put the emphasis on consistency. … Craft brewers and distillers use the enzymes in the malted grain to produce wort, and the resulting sugars are fed to yeast to produce alcohol.").

With this in mind, we must now ascertain whether the designation MECHANICALLY FLOOR-MALTED is understood by the relevant purchasing

---

[3] Applicant does not dispute this, and in fact suggests that the proper genus may be more narrowly defined as "floor malted malts and floor malting grain processing services." 13 TTABVUE 7.

public as primarily referring to "malt for brewing and distilling" and "the processing of agricultural grain."

Applicant argues, relying primarily on the holding in *Princeton Vanguard*, that none of the Examining Attorney's evidence uses the exact term "mechanically floor-malted" as a generic designation for the identified goods or services, and that only one source, an excerpt from a book entitled *Malt and Malting* published in 1992, includes a single reference to a slightly different term "mechanical floor-malting" within the context of discussing malting systems in England and Germany. Applicant maintains that the paucity of third-party uses means that the relevant class of purchasers does not perceive "mechanically floor-malted" as the genus for Applicant's goods and services. Applicant criticizes the Examining Attorney's genericness refusal as being based solely on evidence regarding the meaning of the mark's individual components. Applicant also asserts that the Examining Attorney's reliance on third-party use and Applicant's own website is misplaced noting that while the terms "mechanical conveyors," "mechanical devices" and "mechanical shovels" do appear, there is no mention of the proposed mark "mechanically floor-malted." With respect to Applicant's use on its website of "Mechanical Floor-Malting" to designate its "proprietary" malting process, Applicant submits that the initial capitalization is indicative of trademark, not generic, use.

Applicant misapprehends the holding of *Princeton Vanguard*. The fact that there is no evidence of third-party use of the precise term "mechanically floor-malted" is not, by itself, necessarily fatal to a finding of genericness. As the Court emphasized:

> [T]here is only one legal standard for genericness: the two-part test set forth in *Marvin Ginn*. … Regardless of whether the mark is a compound term or a phrase, the applicable test is the same and the Board must consider the record evidence of the public's understanding of the mark as a whole. *Am. Fertility*, 188 F.3d at 1348-49. Our decision in *Gould* merely provides additional assistance in assessing the genericness of compound terms where it can be shown that "the public understands the individual terms to be generic," and the joining of those terms into one compound word provides no additional meaning. *Id.* It is not a short-cut and does not supplant the two-part test set forth in *Marvin Ginn.*"114 USPQ2d at 1830-32.

*Princeton Vanguard* was explicit in not overruling *In re Gould*, an ex parte appeal, where dictionary definitions and Applicant's explanatory text in its specimen sufficed to establish genericness. Indeed, the Court emphasized that in *In re Gould,* "the most damaging evidence" was applicant's own specimen, a marketing brochure, and how this informed public perception of the mark at issue:

> The applicant in *Gould* sought to register the mark SCREENWIPE for goods identified as "pre-moistened, anti-static cloth for cleaning computer and television screens." 834 F.2d at 1017. While the Board looked to the individual definitions of "screen" and "wipe," we found that "Gould's own submissions provided the most damaging evidence that its alleged mark is generic and would be perceived by the purchasing public as merely a common name for its goods rather than a mark identifying the good's source." *Id.* at 1018-19. Indeed, Gould described its own product as "a … wipe … for … screens." *Id.* at 1019. Given this admission, we noted that the "compound immediately and unequivocally describes the purpose, function and nature of the goods as Gould itself tells us." *Id.* ("Gould has simply joined the two most pertinent and individually generic terms applicable to its product, and then attempts to appropriate the ordinary compound thus created as its trademark."). In that context, where the mark in its entirety has exactly the same meaning as the individual words, we stated that "the PTO has satisfied its evidentiary burden if, as it did in this case, it produces evidence … that the separate words joined to form a compound have a meaning identical to the meaning

> common usage would ascribe to those words as a compound." *Id.* at 1018. Because "the terms remain as generic in the compound as individually," we concluded that the compound itself was generic. *Id.* at 1019.

*Id.* at 1831. *Princeton Vanguard,* by remanding for full consideration of dueling surveys, simply underscores that all evidence bearing on public perception must be given appropriate consideration. *Id.* at 1833. *See Frito-Lay N. Am., Inc. v. Princeton Vanguard, LLC*, 124 USPQ2d 1184 (TTAB 2017) (on remand, Board found defendant's asserted mark PRETZEL CRISPS generic for "pretzel crackers"). *Cf. In re Country Music Ass'n Inc.*, 100 USPQ2d 1824, 1831 (TTAB 2011) (genericness refusal reversed; Board considered results from consumer survey showing that 85% of respondents perceive COUNTRY MUSIC ASSOCIATION as a proprietary or brand name, and not a generic term).

Here, as in *In re Gould*, the record consists of dictionary and industry specific evidence demonstrating the use of the words, "mechanical," "mechanically," "malt," "malting," "malter," "malted," "floor-malting," "floor-malted," and "floor-malter," and demonstrating how these words may be used together. These examples clearly show the meanings that relevant consumers attribute to those words when they are used separately and when they are used together. The purchasers in this case are not members of the general public who might not be familiar with the processing of grain for brewing or distilling. Here, the customers are those in the brewing and distilling business who are likely to know exactly what MECHANICALLY FLOOR-MALTED malt is and the process for producing this type of malt, regardless of the grammatical form of the word "mechanical" or whether "floor-malted" is spelled with a hyphen.

Applicant further takes the position that under *In re Cordua,* Applicant's own use of its mark in connection with its own goods and services is of limited probative weight. However, contrary to Applicant's reading of *In re Cordua,* an applicant's own website or marketing materials may be probative, or even, as in *Gould,* "the most damaging evidence," in indicating how the relevant public perceives a term. *See Princeton Vanguard* and *In re Gould, supra*; *see also In re Empire Tech. Dev. LLC,* 123 USPQ2d 1544 (TTAB 2017) (Board considered applicant's own website and promotional video in finding COFFEE FLOUR generic). *Cf. In re N.C. Lottery,* 123 USPQ2d at 1710 ("the TTAB did not err by considering the explanatory text of the specimens in the descriptiveness inquiry"). On its website specimen, Applicant admits that "floor-malted" refers to a type of malt (available not only from Applicant but from others) for brewing and distilling and that "floor-malting" is a process performed by others:

> Floor-malting is considered the pinnacle of "artisanal" malting …
> however, there are very few sources for this type of premium malt.
> Even if you happen to find a craft malt that has been floor-malted,
> inconsistencies occur from batch to batch.

Indeed, Applicant's suggestion in its brief that a possible genus for the goods is "floor-malted malts" constitutes an outright admission that "floor-malted" identifies a type of malt. 13 TTABVUE 7. With regard to its services, Applicant concedes that floor-malted malt can be produced using machinery to process grain. In Applicant's own words:

> Some of the world's most sought after malt is still prepared in this
> traditional manner. Commonly referred to as "floor-malting,"
> grain that has been soaked in water for up to 48 hours is spread
> over a cement floor to an even depth of 8"-12" inches. The grain is

> turned by hand every 8 hours so that the heat generated from the growing barley does not kill the grain. …
>
> By combining the old world approach to floor-malting with today's modern technology, we have designed a malting machine capable of producing the finest quality, consistent malt available.

Applicant's specimen. Applicant, citing references to other pneumatic and industrial malting systems, acknowledges that it "is not the inventor of mechanized malting systems generally, nor are mechanized malting systems new to the relevant market or industry." 16 TTABVUE 4. Consistent therewith, Applicant touts on its web site the superior technology it uses to process agricultural grain:

> Our Mechanical Floor-Malters are capable of producing 10-15 tons of finished malt. Our grain bed depths are shallow, 12-16", just like traditional floor malting systems. Most commercial malt is produced in deep grain beds anywhere from 3 to 4 feet. Hot air is forced up through this bed in order to kiln the malt resulting in a large use of energy. Stratification also occurs because this grain isn't turned completely over during the malting process. Our Mechanical Floor-Malter is a continuously moving circuit of grain inside a closed system. Each step of the malting process takes place within this system, making our machines a "uni-malter." Continuous movement and shallow grain beds equal reduced energy consumption and more consistent malt.

Applicant's specimen. The evidence demonstrates that the relevant consumers are familiar with the process of mechanized floor malting and the type of malt produced. The record as a whole establishes that with regard to the International Class 31 goods, consumers would understand the designation "mechanically floor-malted" to signify a specific kind of "[m]alt for brewing and distilling." Similarly, with respect to the International Class 40 services, this evidence also shows that consumers would understand Applicant's proposed mark as a whole to identify "[p]rocessing of agricultural grain." As per *Gould*, a proposed mark is generic if "it can be shown that

'the public understands the individual terms to be generic,' and the joining of those terms into one compound word provides no additional meaning." *Princeton Vanguard*, 114 USPQ2d at 1832 (internal quotation omitted). The fact that the proposed mark at issue here is not a single compound word does not alter the underlying logic of this approach. In other words, no other meaning, other than the generic name for the goods and services can be ascribed to "mechanically floor-malted." *See also Princeton Vanguard*, 114 USPQ2d at 1831. Thus, the record shows that the mark Applicant seeks to register will be understood by the relevant public primarily as referring to the identified genus of goods and services.

The fact that Applicant's proposed mark is not a noun does not render it less generic. It is well established that generic designations need not be nouns:

> [W]e readily acknowledge the sometimes-used distinction that generic names are nouns and descriptive terms are adjectives. 2 J.T. McCarthy, McCarthy on Trademarks and Unfair Competition, Section 12:10 (4th ed. 1997) ["A rule of thumb sometimes forwarded as distinguishing a generic name from a descriptive term is that generic names are nouns and descriptive terms are adjectives. However, this "part of speech" test does not accurately describe the case law results."]. Here, we recognize that applicant's mark does not present the classic case of a generic noun, but rather a generic adjective. In this case, because the term ATTIC directly names the most important or central aspect or purpose of applicant's goods, that is, that the sprinklers are used in attics, this term is generic and should be freely available for use by competitors.

*In re Central Sprinkler Co.*, 49 USPQ2d 1194, 1199 (TTAB 1998); *see also Sheetz of Del., Inc. v. Doctor's Assocs. Inc.*, 108 USPQ2d 1341, 1366 (TTAB 2013). Adjectival phrases are common forms of speech, such that consumers will recognize Applicant's proposed mark as the generic designation for the goods and services.

Applicant may be the first to use the precise phrase "mechanically floor-malted" to designate "[m]alt for brewing and distilling" in International Class 31 and "[p]rocessing of agricultural grain." Applicant might even be the creator of a new mechanized process for producing floor malt. But whether this is true or not, this does not affect the generic nature of Applicant's proposed mark. The record shows that the relevant public in this market will perceive the designation "mechanically floor-malted" as the generic designation for such goods and services. *See Sheetz of Del., Inc. v. Doctor's Assocs. Inc.*, 108 USPQ2d at 1362 ("Even if applicant was the first and/or sole user of a generic term or phrase, as it claims, that does not entitle applicant to register such a term or phrase as a mark.") (internal citations omitted). *See also In re Greenliant Sys. Ltd.*, 97 USPQ2d 1078, 1083 (TTAB 2010). Likewise, Applicant's attempt to appropriate this term for itself with the use of initial capitalization on its website is futile. As the Federal Circuit has emphasized: "The test is not only whether the relevant public would itself *use* the term to describe the genus, but also whether the relevant public would *understand* the term to be generic." *In re 1800Mattress.com IP LLC*, 92 USPQ2d at 1685. We therefore find that Applicant's proposed mark is incapable of functioning as a source indicator.

**Decision**: The descriptiveness refusal under Trademark Act Section 2(e)(1) is affirmed; the refusal under Trademark Act Sections 23 and 45 to register Applicant's proposed mark on the Supplemental Register because it is generic with respect to the identified goods and services and therefore incapable of serving as a source indicator is also affirmed.